IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Todd Brubaker, | : | Case No. 1:13-cv-866 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | |
| Western & Southern Financial Group, | : | Order Granting Defendant's Motion for |
| Inc., | : | Summary Judgment |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant Western & Southern Financial Group, Inc.'s Motion for Summary Judgment. (Doc. 26.) Plaintiff opposes the Motion. For the reasons that follow, Defendant's Motion will be **GRANTED**.

I.  BACKGROUND

   A. Facts[1]

This disability discrimination suit arises from Plaintiff Todd Brubaker's employment and termination from employment with Defendant Western & Southern Financial Group, Inc. ("W&S"). Plaintiff was hired by W&S in 1999 as a Sales Representative. (Brubaker Dep., Doc. 27 at PageID at 132.) Most recently, Brubaker held the title of Director of Marketing and Sales. (*Id*.)

---

[1] The Court typically draws its facts from the moving party's statement of undisputed facts and the opposing party's affirmation or denial of those facts in response thereto. Although Defendant submitted its undisputed facts, the Plaintiff failed to respond. Accordingly, the Court refers directly to the record. In response to a motion to summary judgment, Judge Dlott's standing order requires the opposing party to formally identify, in writing, with appropriate citation to evidence of record, any "proposed undisputed facts" that is disputed. Plaintiff's failure to do so technically waives any objection. *Day v. National Elec. Contractors Ass'n,* No. 1:13-cv-547, 2015 WL 1222391, n.1 (S.D. Ohio mar. 18, 2015) (citing *Potter v. District of Columbia*, 558 F.3d 542, 548 (D.C. Cir. 2009); *Gosselin v. Webb*, 242 F.3d 412, 414 n. 2 (1st Cir. 2001); *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1057 (7th Cir. 2000)).

Plaintiff was diagnosed with costochondritis in 2007, a condition that involves inflammation of the cartilage that connects the rib to the sternum. (*Id*. at PageID 162.) The pain associated with the condition mimics that of a heart attack. (*Id*.)

On October 22, 2012, Brubaker was placed on a 90-day disciplinary probation for "unprofessional conduct, poor judgment and improper use of business expenses." (Doc. 27-3 at PageID 276.) Brubaker was placed on probation for attending a topless bar with several subordinates and expensing meals to his company credit card at restaurants within close proximity to his home. (Brubaker Dep., Doc. 27 at PageID 148–50; Doc. 27-3 at PageID 276.) Brubaker was warned that failure to improve his behavior could result in discharge. (Doc. 27-3 at PageID 276.)

On November 13, 2012, following a W&S awards banquet, Brubaker and other W&S employees attended Champs, a bar in downtown Cincinnati in the vicinity of where the banquet was held. (Brubaker Dep., Doc. 27 at PageID 150.) According to witnesses, a verbal altercation between Brubaker and a W&S Sales Manager, Michael Ohlemacher, occurred at Champs. (*See* Doc. 28-3 at PageID 373–84, 393, 419–23.) Brubaker acknowledges speaking to Ohlemacher at Champs, but describes the incident as a "conversation." (Brubaker Dep., Doc. 27 at PageID 150.) Although what was said between the men is disputed, Plaintiff admits he became agitated with Ohlemacher and told Ohlemacher he was being or acting like an idiot. (*Id*. at PageID 155.)

The morning following the incident at Champs, Ohlemacher tendered his resignation from a field advisory board, a group of W&S field sales personnel who meet on occasion to discuss ideas for improvement of the field sales distribution channel with Tony Garcia, the President of Agency. (Payne Dep., Doc. 29 at PageID 428; Chiodi Dep., Doc. 28 at PageID

315.) Ohlemacher's resignation prompted concern and led to the investigation into the incident between Ohlemacher and Brubaker at Champs. (Chiodi Dep., Doc. 28 at PageID 308.)

There are several conflicting statements about what occurred at Champs, the details of which are not expounded upon here. However, after an investigation into the incident, the Human Resources Director, Kim Chiodi, recommended that Brubaker's employment be terminated, a decision that was approved by Noreen Hayes, Senior Vice President of Compensation, Benefits and Education. (*Id*. at PageID 325.) On January 11, 2013, Brubaker met with Chiodi and Keith Payne, Vice President of Sales, at which time he was informed that his employment with W&S was terminated. (Brubaker Dep., Doc. 27 at PageID 158.)

### B. Procedural History

Plaintiff initiated this lawsuit on November 22, 2013. In his Complaint, Plaintiff alleges claims of disability discrimination under the Americans with Disabilities Act, as amended (the "ADA"), disability discrimination under Ohio Rev. Code § 4112.99, breach of contract, and wrongful termination.[2] Plaintiff seeks back pay, lost benefits, compensatory damages, punitive damages, pre and post judgment interest, attorneys' fees and costs, and any other relief to which he is entitled. On April 15, 2015, Defendant filed a Motion for Summary Judgment, which is now pending before the Court.

---

[2] Defendant asserts that although Plaintiff stated that he was bringing his claim in part under the Age Discrimination in Employment Act and exhausted his administrative remedies for both disability and age discrimination claims, he did not adequately plead an age discrimination claim under state or federal law. Plaintiff's Complaint asserts "COUNT I (Disability Discrimination) (ADA)" and "COUNT II (Disability Discrimination) (Section 4112.99)" and states that Defendant "discriminated against Plaintiff and terminated his employment because of disability." (Doc. 1 at PageID 6–7.) Plaintiff did not include similar counts or language to assert age discrimination claims. Regardless of whether Plaintiff met the pleading standards to assert an age discrimination claim under state or federal law, Plaintiff did not respond to Defendant's arguments about why his age discrimination claims, if any, should fail on the merits. As such, even if the Court broadly construed Plaintiff's Complaint to include an age discrimination claim, Plaintiff abandoned any such claim in failing to respond to Defendant's arguments for summary judgment. *See Brown v. VHS of Mich.*, 545 Fed. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.")

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of showing that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

4

### III.     ANALYSIS

#### A.  Disability Discrimination Under Federal and State Law

Plaintiff alleges that W&S discriminated against him on the basis of his disability in violation of both the ADA and Ohio Rev. Code § 4112.99.  The crux of Plaintiff's disability discrimination claims is that other non-disabled employees were treated more favorably than him with regard to discipline and ultimately, termination.

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Under the ADA, disability discrimination claims based on circumstantial evidence, as in this case, are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Talley v. Family Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1105 (6th Cir. 2008) (applying the burden-shifting framework to an ADA claim).  Under the burden-shifting framework of *McDonnell Douglas*, the plaintiff must establish a prima facie case under the relevant statute.  *Talley,* 542 F.3d at 1105.  "A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1114 (6th Cir. 2001).  Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision.  *Talley*, 542 F.3d at 1105.  If the defendant makes the appropriate showing, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason was a pretext for discrimination.  *Id*.

The Ohio and federal anti-discrimination statutes contain similar prohibitions against disability discrimination, and Ohio courts rely on interpretations of the ADA as persuasive

5

authority in interpreting Ohio's disability discrimination law. *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 206–7 (1998). Thus, the Court will analyze Plaintiff's disability discrimination claims under the ADA for purposes of both his federal and state disability discrimination claims.

### 1. Prima Facie Case

Pursuant to this framework, the Court will first determine whether Plaintiff has stated a prima facie case of disability discrimination. There are five elements of a prima facie case of discrimination under the ADA: the plaintiff must show that (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) he was replaced or the position remained open while the employer looked for other applicants. *Plant v. Morton Intern., Inc.*, 212 F.3d 929, 936 (6th Cir. 2000). The fifth element also can be assessed by analyzing whether the employer treated "similarly situated non-protected employees . . . more favorably." *Hopkins v. Elec. Data Sys.*, 196 F.3d 655, 660 (6th Cir. 1999).

Defendant asserts that even if Plaintiff were able to meet the other elements of his prima facie case, he has failed to identify any similarly situated non-protected employees who were treated more favorably than him.[3] "[A] 'plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment' to be considered 'similarly situated.' Instead, a plaintiff need show only that he and his comparator were 'similar in all of the *relevant* aspects.'" *Wheat v. Fifth Third Bank*, 785 F.3d 230, 238 (6th Cir. 2015) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

---

[3] Defendant asserts that it disputes that Plaintiff is disabled under the law, but will assume his medical condition qualifies as a disability for purposes of its Motion for Summary Judgment only. (Doc. 27 at PageID 99, n.2.)

In responding to Defendant's Motion, Plaintiff identified two comparators he claims were similarly situated to him and treated more favorably: Greg Shaeffer and Gene Patterson. Plaintiff asserts that Shaeffer was a member of executive management and both used his credit card near his home and visited a strip club with a subordinate but was not disciplined by W&S. In support of his position, Plaintiff relies upon Shaeffer's deposition testimony that Shaeffer regularly used his credit card near his home. (Shaeffer Dep., Doc. 37 at PageID 811–13.) Shaeffer also admitted to visiting a strip club with another W&S employee two or three times but not being disciplined for the conduct. (*Id*. at PageID 809–10.) However, Plaintiff has not identified any evidence that W&S management was aware of Shaeffer's behavior.

Plaintiff also alleges Patterson was similarly-situated but treated differently than he was with respect to discipline. Plaintiff asserts Patterson was an executive level employee who "had a higher leadership position than the Plaintiff." (Doc. 34 at PageID 623.) Plaintiff argues that deposition testimony confirms that Patterson swore at subordinates and engaged in verbal altercations with strangers while maintaining his leadership position at W&S. (Shaeffer Dep., Doc. 37-1 at PageID 749; Carnicom Dep., Doc. 36-1 at PageID 715.) Plaintiff asserts that Patterson yelled at him and that he reported the incident to his supervisor, Keith Payne. Payne recalls Plaintiff reporting Patterson getting in his face and yelling at him "a couple years ago," but does not know if the incident was ever investigated. (Payne Dep., Doc. 29 at PageID 439.) The evidence establishes that Patterson is no longer a Divisional Vice President and is now an Agency Manager, which is two steps down from Divisional Vice President. (*See, e.g.*, Harrison Dep., Doc. 35-1 at PageID 676–77.) However, the cited evidence does not demonstrate why Patterson was demoted and how his positions compared to that of Plaintiff's position. From this evidence, Plaintiff asserts Patterson was treated more favorably than he was.

7

Plaintiff has not cited to record evidence regarding whether Shaeffer and/or Patterson are similar to him with respect to their positions and disciplinary histories. Although the Court acknowledges that the prima facie burden is "less-than-onerous," the Plaintiff has come forward with little evidence for the Court to engage in any meaningful analysis as to whether Plaintiff and his alleged comparators are in fact similarly situated in the relevant respects. *Compare Proffitt v. AK Steel Corp.,* No. C-1-03-471, 2006 WL 212074, at *6 (S.D. Ohio Jan. 25, 2006) (summary judgment appropriate where plaintiff "presented no facts whatsoever regarding the nature of the accidents she allegedly saw – no who, what, when, why or how – and therefore no evidence that those men were similarly situated to her.") with *Wheat*, 785 F.3d at 238 (overruling district court's decision that plaintiff had not met his prima facie burden and finding that plaintiff created at least a question of fact as to whether he and his alleged comparators were similarly situated). For example, the Court has scant information to meaningfully understand how Plaintiff's position compares to those of Shaeffer's or Patterson's and or how either employee's disciplinary histories compare to Plaintiff's. There is also limited information about the who, what, and where of Patterson's alleged misconduct and no information that management was aware of Shaeffer's alleged misconduct. Finally, the Court also notes that Plaintiff has not come forward with evidence that either alleged comparator falls outside the protected class.

Summary judgment on a disability discrimination claim in favor of the employer is appropriate where there is no evidence that the alleged comparators are not disabled or similarly situated. *Watson v. Kraft Foods,* No. 2:06-cv-163, 2007 WL 666620, at *9 (S.D. Ohio Feb. 27, 2007) (granting summary judgment for the employer on ADA claim where there was no evidence of non-disabled comparators); *Ramsey v. Hamilton Cnty. Sheriff's Dept*., No. 1:05-cv-116, 2006 WL 1207984, at *4 (S.D. Ohio May 3, 2006) ("Plaintiff has also failed to identify

8

non-disabled, similarly situated employees who engaged in materially similar conduct and did not face similar consequences. For that additional reason, Defendant would be entitled to summary judgment with respect to Plaintiff's claim based upon the resignation of her employment even if she could establish a prima facie case under the ADA."). *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 659 (6th Cir. 1999) (disparate treatment claim requires evidence that plaintiff was treated differently than an employee who was similarly situated in all material respects).

As Defendant has identified an absence of evidence and as Plaintiff has failed to identify any record evidence to support that the alleged comparators are non-disabled and similarly-situated, Plaintiff is unable to establish his prima facie case of disability discrimination.[4] As such, summary judgment on Plaintiff's state and federal disability discrimination claims is appropriate.[5]

## 2. Legitimate Non-Discriminatory Reason and Pretext

Even if Plaintiff were able to establish a prima facie case of discrimination, summary judgment would nevertheless be appropriate for W&S. Defendant asserts that W&S conducted a thorough investigation into the verbal altercation between Brubaker and Ohlemacher and terminated Brubaker's employment based upon its honest belief that he was at fault for the incident at Champs. Having articulated a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts to Plaintiff to show that the legitimate, nondiscriminatory reason is

---

[4] "[J]udges are not like pigs, hunting for truffles that might be buried in the record." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Nor does Fed. R. Civ. P. 56 require the Court to hunt for evidence, as the Court need only consider cited materials in ruling on a motion for summary judgment. In this case, Plaintiff has not cited record evidence that his alleged comparators are non-disabled.

[5] The Court notes that the Defendant also contests whether the alleged comparators were valid comparators in other respects and whether Plaintiff has come forward with evidence of pretext to rebut Defendant's proffered legitimate, non-discriminatory reasons for Plaintiff's discharge from employment. Having found that the issue of evidence of non-disabled comparators dispositive, the Court need not address these other arguments.

a pretext for discrimination by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the employer's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Clay v. UPS*, 501 F.3d 695, 704 (6th Cir. 2007). "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 n.4 (6th Cir. 2009).

When a defendant has an "honest belief" in the non-discriminatory basis upon which it made its employment decision, the plaintiff will not be able to satisfy her burden. *Tingle v. Arbors at Hilliard,* 692 F.3d 523, 530–31 (6th Cir. 2012) (citing *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001)). "The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process." *Id.* at 531. The Sixth Circuit has recognized that the "key inquiry ... is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Id*. (citing *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 598–99 (6th Cir. 2007)). Although the employer must point to particularized facts upon which it reasonably relied in making its employment decision, the decisional process used by the employer need not be optimal or leave no stone unturned. *Id*. (citing *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998)). A defendant thus may rely on the honest belief rule "'even if its conclusion is later shown to be 'mistaken, foolish, trivial or baseless.'" *Chen v. Dow Chem. Co.,* 580 F.3d 394, 401 (6th Cir. 2009) (quoting *Clay v. UPS,* 501 F.3d 695, 713–15 (6th Cir. 2007)).

To defeat a summary judgment motion in such circumstances, the "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] ... did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.,* 258 F.3d 488, 493–94 (6th Cir.

10

2001). For example, the plaintiff may produce evidence that an error by the employer was "too obvious to be unintentional." *Smith,* 155 F.3d at 807. However, "[a]n employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Tingle,* 692 F.3d at 531 (quoting *Seeger v. Cincinnati Bell Tel. Co*., 681 F.3d 274, 285 (6th Cir. 2012)).

In this case, Plaintiff attempts to show pretext by arguing the Defendant's reason for his termination had no basis in fact, or by challenging the reasonableness of W&S's investigation into the Champs bar incident. Plaintiff argues that the investigatory process lacked reasonableness and good faith and that the Defendant acted with the intent to "reduce executive level position[s] by any means necessary." (Doc. 34 at PageID 627.) Plaintiff challenges the investigation on the basis of who was interviewed, when those interviews occurred, and which interviews were given more weight by the Defendant. Plaintiff essentially argues that his version of events was not given credit and that the witness who corroborated his version of events, Jesse Harrison, was interviewed after Chiodi made a recommendation to terminate Plaintiff's employment. For the reasons that follow, the Court finds Plaintiff has failed to rebut Defendant's honest belief.

The Court will briefly retrace W&S's investigation into the incident at the Champs bar. Chiodi began investigating the incident at the Champs bar when she learned of Ohlemacher's November 15, 2012 email to Garcia following the W&S awards banquet. (Chiodi Dep., Doc. 28 at PageID 319.) Chiodi identified six potential witnesses, each of whom were W&S employees and were interviewed by Chiodi during the investigation process: Brubaker, Ohlemacher, Jesse Harrison, Kory O'Neal, Greg Shaeffer, and Becky Larick. (*See* Doc. 28-3 at PageID 373–84, 393, 419–22.) The details of the incident are disputed by these witnesses, and the record is clear

11

that all witnesses had been drinking the evening of the incident. (Chiodi Dep., Doc. 28 at PageID 317.)

Brubaker and Ohlemacher's version of events conflict with regard to who was the aggressor. Brubaker asserted that he saw Ohlemacher at the Champs bar and congratulated Ohlemacher on a great year, and Ohlemacher began cursing at him. (*Id*. at PageID 368–69.) Brubaker asserted that he walked away from the situation. (*Id*.) By contrast, Ohlemacher asserted he saw Plaintiff at the bar and said hello, but Plaintiff responded with belittling comments, such as "If I could fire you, I would." (*Id*. at 374–77.)

Larick asserted Brubaker told Ohlemacher, "You don't deserve to be down here" in an "obnoxious and belligerent tone," and then said, "I'm just kidding. Congrats, Mike!" (*Id*. at 419–22.) Shaeffer recalled Brubaker speaking to Ohlemacher in an aggressive and belittling manner and directing profanity at Ohlemacher. (*Id*. at 383–84.) Jesse Harrison asserted that he observed Ohlemacher cursing at Brubaker, and at some point in the conversation, Brubaker called Ohlemacher an idiot. (*Id*. at 371–72.) Kory O'Neal did not recall the incident but spoke to Ohlemacher after it occurred. (*Id*. at 373.)

On December 10, 2012, Chiodi recommended in a report to Hayes that Plaintiff's employment be terminated, stating that "[g]iven the nature of the November 13 incident, and the fact that Todd was on probation for similar unprofessional conduct, it is recommended that his employment be terminated." (Doc. 28-3 at PageID 393.) Chiodi gave more weight to Shaeffer's account than the others' because he was the highest ranking and most disinterested witness. (*Id*. at PageID 340-41.) Chiodi considered the fact that Harrison was a subordinate of Brubaker's and Larick was Ohlemacher's manager. (*Id*.) Hayes reviewed and approved Chiodi's recommendation on January 10, 2013. (Doc. 28-1 at PageID 327.)

Brubaker argues that the investigation was a sham because Jesse Harrison, whose account credited Brubaker's side of the story, was not interviewed at the time Chiodi first spoke to Hayes about her recommendation to terminate Brubaker's employment. Hayes and Chiodi met on November 30, 2012, prior to Harrison's December 3, 2012 interview. (Hayes Dep., Doc. 30 at PageID 535; Chiodi Dep., Doc. 28 at PageID 313.) At their meeting, Chiodi updated Hayes about the content of Larick's and Shaeffer's statements about the Champs incident and informed Hayes of her recommendation that Brubaker's employment be terminated. (Doc. 30 at PageID 536.) Later, on November 30, 2012, Chiodi met with Payne, and told Payne that her recommendation was that Brubaker's employment be terminated. (Doc. 28 at PageID 323–24.) Payne asked if Chiodi had spoken with Harrison and O'Neal and when Chiodi said no, Payne asked that they be interviewed. (*Id*.) Thereafter, Chiodi interviewed Harrison on December 3, 2012 and O'Neal on December 8, 2012. (*Id*; Doc. 28-3 at PageID 568–73.) Both Chiodi and Hayes testified that the final termination decision was made on January 10, 2013 and required Hayes' final approval. (Doc. 28 at PageID 327; Doc. 30 at PageID 535–36.)

Plaintiff argues his termination was predisposed in light of the foregoing timeline, and that he can establish pretext with factual inconsistencies or the methods by which Chiodi conducted her investigation. The Sixth Circuit has noted that an "'optimal' investigation – i.e., interviewing the employee and some or all of his witnesses – is not a prerequisite to application of the honest belief rule." *Seeger*, 681 F.3d at 286. Additionally, "[w]ithout more, such as evidence that [Chiodi] typically interviews all witnesses identified by employees accused of wrongdoing but did not do so in [Plaintiff's] case, [Chiodi's] failure to interview the witnesses identified by [Plaintiff] is not sufficient to demonstrate pretext." *Younger v. Ingersoll-Rand Co*, No. 1:10-cv-849, 2013 WL 5467763, at *18 (S.D. Ohio Sept. 30, 2013). In any event, Chiodi

ultimately did interview all W&S witnesses. While the evidence may show the investigational methods were less than perfect, "the applicable law does not require that an employer's 'decisional process…be optimal' or that the decision-maker leave 'no stone unturned.'" *Id.* (citing *Smith*, 155 F.4d at 807).

The Court concludes that the investigation here was thorough, albeit not necessarily a model investigation. When concern was raised that a decision to terminate was too premature because two witnesses had not been interviewed, Chiodi interviewed the remaining witnesses. The record reflects that W&S made a reasonably informed and considered decision before terminating Plaintiff's employment. "That [Plaintiff] or the court might have come to a different conclusion if they had conducted the investigation is immaterial." *Seeger*, 681 F.3d at 287. Plaintiff has not refuted W&S's honest belief that Plaintiff engaged in an altercation with a junior employee at the Champs bar, and his claim that his termination was a pretext for discrimination necessarily fails. In sum, based on the evidence before the Court, Plaintiff's denial that he committed the conduct complained of and his objection to the manner in which Chiodi conducted the investigation is not sufficient to establish pretext. Moreover, the Court is reminded of the underlying guide to establishing pretext: "whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 n.4 (6th Cir. 2009). There is simply no evidence of concealed intentional discrimination on the basis of disability, nor does Plaintiff seem to argue this motivated Chiodi's actions, as he continually speculates that the reason for his termination was to change executive leadership or restructure management.

For preceding reasons, Defendant is entitled to summary judgment as to Plaintiff's disability discrimination claims.

### B. Breach of Contract

Defendant also asserts it is entitled to summary judgment on Plaintiff's breach of contract claim. In his Complaint, Plaintiff asserts W&S terminated his employment prior to the conclusion of a one-year contract. In moving for summary judgment, Defendant argues that Plaintiff has not come forward with any evidence of a contract sufficient to alter his employment-at-will status under Ohio law. Alternatively, Defendant asserts the terms of the alleged contract would violate the statute of frauds and be unenforceable.

Under Ohio law, "[u]nless otherwise agreed, either party to an oral employment-at-will employment agreement may terminate the employment relationship for any reason which is not contrary to law." *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 483 N.E.2d 150, 153 (1985). However, "[t]he terms of discharge may be altered when the conduct of the parties indicates an intent to impose different conditions regarding discharge." *Condon v. Body, Vickers & Daniels*, 99 Ohio App. 3d 12, 649 N.E.2d 1259, 1263 (1994). The Ohio Supreme Court has articulated two exceptions to the employment-at-will doctrine: "(1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made to an employee." *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St. 3d 571, 653 N.E.2d 381, 384 (1995).

Because Plaintiff has not come forward with a written contract, his claim is based upon an implied contract. Plaintiff testified in his deposition that sometime after October 22, 2012, he discussed with Payne that as a result of his October 22, 2012 discipline, he was being placed on probation and would be demoted by being put back into the sales field. (Brubaker Dep., Doc. 27 at PageID 155.) Plaintiff asserts that he received an email from Payne in October 2012 that constituted a contract, in which he "was given an opportunity to go back in the field by email and

15

[his] salary was guaranteed for a year." (*Id.* at PageID 167.) However, neither party has been able to locate or produce a copy of the alleged email. (*Id*. at PageID 202–03.) According to Plaintiff, in that email, he was guaranteed "that [he] was going to have $150,000 for a year." (*Id*. at PageID 167.) Plaintiff admits "[t]here was no starting date put in place because [Payne] didn't know when [Brubaker] was going back to the field." (*Id*. at PageID 167.) According to Plaintiff, they "couldn't have known" the end date without the start date, but "the end date was one year after the start date." (*Id*.)

Payne testified during his deposition that he discussed a moving package with Plaintiff and that Plaintiff's salary would be based on what was communicated to him, which would then be provided in a standard moving package. (Payne Dep., Doc. 29 at PageID at 438.) Payne does not remember whether he emailed the details to Plaintiff. (*Id*.) One of the things Payne and Brubaker discussed was "what [Brubaker's] salary would be, and it was basically a transitional salary to allow him to build his operation in the field back underneath him[.]" (*Id.* at PageID 439.) Payne also testified that Brubaker's receiving the discussed job was contingent upon the outcome of the investigation of the incident at Champs, and therefore, he could not make any guarantees to Brubaker about the job. (*Id*. at PageID 445.)

Defendants contend this evidence, construed in the light most favorable to the Plaintiff, is insufficient to establish a contract of employment existed between Plaintiff and W&S and altered Plaintiff's at-will status. The Court agrees that even if the email as described by Plaintiff existed, it does not constitute a "clear and unambiguous promise of continued employment for a specific period as required by Ohio law." *Daup v. Tower Cellular, Inc*., 136 Ohio App. 3d 555, 737 N.E.2d 128, 135 (2000) (citing *Corradi v. Soclof*, No. 67586, 1995 WL 322311, at *2 (Ohio App. May 25, 1995)). The facts of this case are analogous to *Daup*, in which an Ohio court of

16

appeals examined whether the plaintiffs' allegation that their employer promised they would be working for their employer for five or ten years in the future constituted sufficient evidence that the plaintiffs' at-will employment status had been altered. *Id*. at 562–63. The court determined that the representations cited by the plaintiffs were insufficient to establish an implied contract of continued employment, as the statements were "vague, indefinite promises of future employment" and did not represent that the plaintiffs' employment was secure regardless of their workplace conduct. *Id*. at 563. Additionally, the statements lacked specificity as to the period of time for the contract, as required by Ohio law. *Id*. Similarly, in this case, the exact term of the contract, including when it would begin, is ambiguous. Moreover, there is no allegation that Plaintiff would be immune from misconduct under the alleged terms. Indeed, Payne testified that the discussed position was not guaranteed and contingent upon the outcome of the Champs incident investigation. (Payne Dep., Doc. 29 at PageID 445.) As in *Daup*, the facts here are insufficient to establish an implied contract under Ohio law.

Alternatively, Defendant contends that Plaintiff's alleged contract violates that statute of frauds. The Ohio Supreme Court has held that "[w]hen parties to an alleged agreement did *not* intend the agreement to be performed in less than a year, the statute of frauds renders that agreement unenforceable." *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 122 Ohio St. 3d 89, 909 N.E.2d 93, 98 (2009) (emphasis in original). Defendant argues that because Brubaker has alleged that he had an employment contract for one year, it could not be performed in less than a year; as such, the alleged contract would be unenforceable pursuant to the statute of frauds. Plaintiff's rebuttal to this argument is that he is not making a claim that his contract was longer than a year. Finding the language of *Olympic* controlling, the Court agrees with Defendant that Plaintiff's contract as alleged would be unenforceable pursuant to the statute of frauds.

For the above reasons, Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.

### C. Wrongful Termination

Finally, in his Complaint, Plaintiff asserts that he was wrongfully discharged in violation of Ohio public policy. Under Ohio law, a claim of wrongful termination requires a plaintiff to prove the following four elements: (1) a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law; (2) in general, dismissing employees under circumstances like those involved in the plaintiffs dismissal would jeopardize the public policy; (3) the plaintiff's dismissal was motivated by conduct related to the public policy; and (4) the employer did not have a justifiable legitimate business justification for the dismissal. *Wiles v. Medina Auto Parts,* 96 Ohio St. 3d 240, 773 N.E.2d 526, 529–30 (2002). "It is well-established that a wrongful discharge in violation of state public policy claims fails where other statues provide adequate protection and remedies." *Day v. Nat'l Elec. Contractors Ass'n,* No. 1:13-cv-547, 2014 WL 7723580, at *2 (S.D. Ohio Mar. 31, 2014) (citing *Chenzira v. Cincinnati Children's Hosp. Med. Center,* No. 1:11–cv–917, 2012 WL 6721098, at *4 (S.D. Ohio Dec. 27, 2012)). Defendant asserts in its Motion for Summary Judgment that Plaintiff has adequate remedies under other statutes, including the ADA and state law.

Plaintiff did not respond to Defendant's argument in its Memorandum in Opposition to Defendant's Motion for Summary Judgment; thus, consistent with this Circuit's precedent, Plaintiff has abandoned its wrongful discharge in violation of public policy claim. *See Brown v. VHS of Mich.,* 545 Fed. App'x 368, 372 (6th Cir. 2013) (a plaintiff abandons his claim where he fails to address it in response to a motion for summary judgment). On this basis, Defendant is entitled to summary judgment.

**IV. CONCLUSION**

For the reasons set forth herein, Defendant is entitled to summary judgment on all of Plaintiff's claims. Accordingly, Defendant's Motion for Summary Judgment (Doc. 26) is **GRANTED**.

IT IS SO ORDERED.

 s/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court